Filed 9/25/13  In re Natalie B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re NATALIE B., a Person Coming Under the Juvenile Court Law. | |
| | D063630 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14758) |
| v. | |
| JESSICA B., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.


Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Jessica B., the adult sister and legal guardian of minor Natalie B., appeals the juvenile court's jurisdictional finding over Natalie under Welfare and Institutions Code section 300, subdivision (c).[1] We affirm.

FACTUAL AND PROCEDURAL HISTORY

On December 20, 2012, the San Diego County Health and Human Services Agency (Agency) filed a juvenile dependency petition on behalf of 15-year-old Natalie. The petition alleged under section 300, subdivision (c),[2] that Natalie was at substantial risk of harm because she did not have a parent or guardian capable of providing her with appropriate care. The petition further alleged Natalie had major depressive disorder and had been cutting the tops of her feet, as a result of which she had been admitted to Sharp Mesa Vista Hospital under a section 5150 mental health hold. During her hospitalization, the petition alleged, Natalie continued to cut herself. The petition further noted Natalie's history of cutting, suicidal ideations and psychiatric hospitalizations. The petition concluded that Natalie required "mental health treatment which her guardian [was] unequipped to provide."

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] This subdivision provides in pertinent part as follows: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶] (c) The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." (§ 300, subd. (c).)

*Detention*

In a detention report dated December 21, 2012, social worker Charles Montgomery summarized the events preceding the filing of the petition as follows: Natalie's father is deceased and her mother has not been involved in her life since Natalie was three due to drug and alcohol addiction. Natalie's aunt cared for her from age three until she became unable to do so in 2009 due to her own mental health and neglect issues, at which point Jessica began caring for Natalie. In 2010, Jessica was appointed Natalie's legal guardian.

Natalie was diagnosed with "Major Depression Disorder, recurrent severe with Borderline Personality traits," and had previously been diagnosed with the eating disorder anorexia. In May 2012, Natalie began receiving individual therapy because she was extremely depressed, lost 30 pounds due to her eating disorder and continued to have fantasies of killing herself.

In the summer of 2012, Natalie was admitted to University of California, San Diego, counseling and psychological services (CAPS) for two months due to suicidal ideations. While there, Natalie wrote about threatening to kill herself at home so that Jessica and her two-year-old daughter would find her. Within 24 hours of her release from CAPS, Natalie was admitted to Aurora Behavioral Health (Aurora) for cutting on her wrists. Natalie remained at Aurora for one week. In October 2012, Jessica and Natalie began receiving in-home support services from Families Forward Wraparound Program.

3

On December 6, 2012, one of Natalie's teachers called the police after observing that Natalie had been cutting on the tops of her feet for about four days. Natalie was admitted that same day to Sharp Mesa Vista Hospital for a section 5150 hold for being a danger to herself. During her hospitalization, Natalie cut on both wrists numerous times with a staple. Natalie was then placed on one-on-one supervision, not allowed clothing with pockets but instead was required to wear a gown, and was restricted from coming within 10 feet of certain patients.

Social worker Montgomery interviewed Natalie during this hospitalization. Natalie reported that she began cutting herself when she was in sixth grade, that it is addicting and that she does it to be happy. Natalie told Montgomery it was her "visual thinking" that allowed her to write the letter about killing herself at home so that her sister and niece would find her body. Natalie said she loved Jessica, Jessica did not abuse or neglect her, Jessica was meeting all of her needs and she hoped to return to Jessica's home. But Natalie admitted she would not feel safe if she was home alone.

When the hospital deemed Natalie ready for discharge, Jessica declined to pick her up, after which Natalie cut her own arms with a staple again. When the hospital deemed Natalie ready for discharge about two weeks later, Jessica again declined to pick her up due to concerns about keeping Natalie safe at home and about protecting Jessica's daughter from Natalie's suicidal ideations and gestures. After Jessica declined to pick up Natalie the second time, Natalie was admitted to Polinsky Children's Center (Polinsky).

On the day Natalie was admitted to Polinsky, social worker Montgomery interviewed Jessica at her home. During the interview, Jessica stated she was meeting

4

Natalie's needs to the best of her ability, but admitted Natalie's behaviors had gotten "considerably worse" and Natalie was in dire need of "Residential Treatment with intense therapy." Jessica also discussed Natalie's suicidal ideations, including Natalie's plan to either be hit by a train, hit by a car, overdose on pills, or "bleed[] out in a bathtub." Jessica also described Natalie's conduct during her December hospitalization at Sharp Mesa Vista as "glorifying" her cutting behaviors and telling other patients how easy it was to cut oneself and "get away with it."

At the December 21, 2012, detention hearing, the court found the Agency made a prima facie showing under section 300, subdivision (c), and followed the Agency's recommendation by ordering that Natalie be detained at Polinsky, an approved foster home or a licensed group home. The court set a jurisdiction hearing for January 10, 2013.

*Jurisdiction*

In a jurisdiction/disposition report submitted in connection with the January 10 hearing, social worker Susan Melendez recommended the court make a true finding on the petition, Natalie be declared a dependent of the juvenile court and placed in a licensed group home, and that Jessica be offered reunification services. Melendez conveyed that Jessica stated in a January 2 interview that although she would like Natalie back in her home, Jessica understood that she was unable to provide the level of supervision necessary to keep Natalie safe. Jessica further acknowledged to Melendez that Natalie needed a higher level of care than she would receive at home, which Jessica described as a residential treatment facility where Natalie had daily access to therapy, doctors and

5

medication. At the hearing, the court set the matter for a contested jurisdiction and disposition hearing on February 15, 2013.

Between the January 10 and February 15 hearings, the Agency submitted two addendum reports prepared by social worker Melendez. In the first, the Agency noted that Natalie's condition had improved and she had been removed from one-on-one supervision. The report further noted Natalie initially attempted to control her eating, but intervention corrected that issue. In the second report, Melendez reported that Natalie's behaviors continued to improve such that Melendez now recommended that Natalie return to Jessica's care, albeit subject to a true finding on the petition and a court-ordered voluntary case plan.

At the February 15 contested jurisdiction and disposition hearing, Jessica requested a one-month continuance to put family therapy and respite care services in place and to prepare her home for Natalie's return. The court granted Jessica's request and continued the trial date to March 15, with a March 4 pretrial conference.

At the March 4 pretrial conference, the parties informed the court during a chambers conference that they were close to resolving the matter by way of a court-ordered voluntary case plan. Accordingly, the parties stipulated to vacate the March 15 trial date and the court set the matter for a jurisdictional hearing on March 11 "to finalize the settlement."

At the beginning of the March 11 jurisdiction and disposition hearing, the parties informed the court they had agreed to amend the last sentence of the petition from "[Natalie] requires mental health treatment *which her guardian is unequipped to*

6

*provide*," to "[Natalie] requires mental health treatment *and her guardian recognizes that additional assistance would help stabilize Natalie*." (Italics added.) The court noted that as a result of the language change, Jessica "would enter a slow plea and argue." Jessica then asked the court to dismiss the petition based on Natalie's improved condition since the time of the filing, but indicated that if the court were to make a true finding, she was not opposed to the Agency's dispositional recommendation. After commenting on the "many cycles" of mental health issues and Natalie's "cycl[ing] in and out of care" over the summer of 2012 in particular, the court made a true finding on the petition, returned Natalie to Jessica's care, and without adjudicating Natalie a dependent, ordered family preservation services under section 360, subdivision (b).[3]

## DISCUSSION

Jessica contends there was insufficient evidence to support the court's assertion of jurisdiction over Natalie because Natalie's condition had improved sufficiently between the time the petition was filed and the time of the jurisdiction/disposition hearing. The Agency disagrees and asserts Jessica forfeited her right to appeal as a result of the parties' settlement history and Jessica's stipulation to amend the petition to read less culpably as

---

[3] This subdivision provides: "If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301." (§ 360, subd. (b).)

7

to her capacity to care for Natalie.[4] We find the record insufficient to enable us to evaluate the Agency's forfeiture argument and therefore exercise our discretion to decline to apply forfeiture. On the merits, we affirm.

Under section 300, subdivision (c), a minor falls within the juvenile court's jurisdiction if she "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." The petitioner in a proceeding under this subdivision must prove by a preponderance of the evidence that the child who is the subject of the petition comes under the juvenile court's jurisdiction. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; Cal. Rules of Court, rule 5.684(f).) "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

We review jurisdictional findings under the substantial evidence standard of review. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) "In considering a claim of insufficient evidence to support a jurisdictional finding, we review the evidence most favorably to the court's order—drawing every reasonable inference and resolving all conflicts in favor of the prevailing party—to determine if it is supported by substantial

---

[4] Natalie joins the Agency's arguments and positions under California Rules of Court, rule 8.200(a)(5).

8

evidence." (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.) "If it is, we affirm the order even if other evidence supports a contrary conclusion." (*Ibid.*) Moreover, so long as the jurisdictional findings are supported by substantial evidence, the adequacy of the factual allegations in the dependency petition is irrelevant. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1123.)[5]

The record contains sufficient evidence to sustain the dependency petition under section 300, subdivision (c). The social workers' reports and addenda established that Natalie suffers from "Major Depression Disorder, recurrent severe with Borderline Personality traits," and had previously been diagnosed with the eating disorder anorexia. Natalie also suffered from vivid suicidal ideations and self-cutting behavior. These behaviors constitute the type of "emotional damage . . . evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others" required to find jurisdiction under section 300, subdivision (c).

Sufficient evidence also supports the court's conclusion that although Natalie had been stabilized for a brief period by the time of the jurisdiction hearing, she remained at substantial risk for a reoccurrence of her self-destructive behaviors. In fact, in the approximately six-month period preceding the Agency's filing of the petition, Natalie had been hospitalized three times due to her suicidal fantasies, self-cutting and anorexia. During her hospitalizations, Natalie found ways to engage in self-cutting, glorified her

---

5       An exception applies when the parent or guardian claims the petition fails to provide sufficient notice of the factual allegations. (*In re John M.*, *supra*, 212 Cal.App.4th at p. 1123.) Jessica does not contend she received insufficient notice.

cutting behavior to other patients and attempted to control her eating. She also expressed concerns about not feeling safe if she was left home alone.

Natalie has demonstrated that the concern regarding potential reoccurrence is well-founded. In the summer of 2012, she was hospitalized for two months because of suicidal ideations. After she was stabilized enough to be released, she was admitted within 24 hours to another institution due to cutting on her wrists. At the March 11 jurisdiction hearing, the court expressly acknowledged this cyclical pattern of Natalie's mental health issues.

Finally, sufficient evidence supports the conclusion that Jessica was—despite her admirable and valiant efforts—unable to provide on her own the care Natalie required. During Natalie's December 2012 hospitalization, Jessica twice declined to pick her up over concern that she could not prevent Natalie from continuing to harm herself. When interviewed in preparation for the January 10 jurisdiction hearing, Jessica conceded that Natalie needed a higher level of care than Jessica could provide at home. Likewise, at the February 15 hearing when the Agency changed its recommendation to propose that Natalie return to Jessica's home, Jessica asked for a one-month continuance because she was not yet prepared to receive Natalie back into her home. Finally, the amended language of the petition to which Jessica stipulated—that Jessica "recognizes that additional assistance would help stabilize Natalie"—further supports the court's conclusion that Jessica was unable at the time of the hearing to provide Natalie the level of care she required absent a court-ordered case plan.

We applaud Jessica for rising to the occasion to care for her younger sister after her mother and aunt became unable to do so.  But under the circumstances, we find sufficient evidence supports the court's determination that Natalie remained at risk of recurrent self-harm at the time of the jurisdiction hearing and that Jessica was unable to provide the required level of care without court-ordered assistance.

DISPOSITION

The order is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McINTYRE, J.

11